**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BRETT WITTERS and JANELLE WITTERS,** | : | **CIVIL ACTION NO. 1:23-CV-1441** |
| | : | |
| | : | **(Judge Conner)** |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DYLAN SMITH and LATRAVERICK JONES,** | : | |
| | : | |
| **Defendants** | : | |

**<u>MEMORANDUM</u>**

This civil action arises out of an alleged trespass by defendants Dylan Smith and Latraverick Jones, agents of the Pennsylvania Board of Probation and Parole. In July 2021, Smith and Jones purportedly entered an enclosed backyard belonging to plaintiffs Brett and Janelle Witters without their permission; Jones then shot their pet dog, Otis.  The Witters bring a claim pursuant to 42 U.S.C. § 1983 for unlawful seizure in violation of the Fourth Amendment, as well as traditional state tort law claims of trespass to land, trespass to chattel, intentional and negligent infliction of emotional distress, and an as-yet unrecognized claim for loss of consortium and companionship with respect to Otis.  Defendants now move to dismiss the Witters' claims under Federal Rule of Civil Procedure 12(b)(6) on various grounds.  We will grant the motion in part and deny it in part.

I.    **<u>Factual Background & Procedural History</u>**

According to the complaint, Smith and his supervisor, Jones, arrived at the Witters' Mechanicsburg residence in the late morning hours of July 26, 2021.  (<u>See</u>

Doc. 1-1 ¶¶ 4-6).  As agents of the Parole Board, they sought to determine whether the residence would be a "suitable location" to which an inmate, whom the Witters knew personally, could be released on parole.  (See id. ¶ 6).  No one answered when the agents knocked on the front door; Janelle was at work that morning and Brett had stepped out with Otis, their Catahoula leopard dog.  (See id. ¶¶ 5, 8).  The Witters had not been given any advanced notice of the visit and Smith and Jones were not authorized to enter the property.  (See id. ¶¶ 7, 9).  Nevertheless, the agents unlatched the Witters' wrought iron gate, walked "down a path" into their "fully fenced-in backyard," and knocked on the back door.  (See id. ¶ 8).

Brett returned home with Otis around this time.  (See id. ¶ 10).  Unaware of the agents' presence, he allowed Otis to enter the backyard through the detached garage at the rear of the property.  (See id. ¶ 10).  Moments later—and without warning—Jones fired two shots from his 9mm Glock handgun, one of which struck Otis in the jaw.  (See id. ¶ 11).  The Witters aver that Otis did not provoke the shooting by making any "threatening gestures or actions" toward the agents; in fact, they assert he "has no history of aggressive behavior" whatsoever.  (See id. ¶ 12).  According to the complaint, Smith and Jones promptly fled.  (See id. ¶ 13).

The Witters rushed Otis to a veterinary care facility in Harrisburg where he underwent emergency surgery; despite losing "part of his jaw and at least seven teeth," Otis survived.  (See id. ¶¶ 14-15).  Otis was prescribed pain medication, and he continues to take anxiety medication because of the shooting.  (See id. ¶ 16).  He has trouble sleeping, suffers panic attacks, and can no longer enjoy certain hallmark activities of being a dog, like chewing bones and playing fetch.  (See id. ¶¶ 16-17).

2

The Witters assert that they, too, have suffered emotional distress, including a persistent inability to feel safe in their home and a lack of faith in law enforcement. (See id. ¶ 18). They filed this action in the Court of Common Pleas of Cumberland County in July 2023, and defendants removed it to this court soon thereafter pursuant to 28 U.S.C. § 1446. The complaint raises five claims: trespass to land (Count I), trespass to chattel (Count II), unlawful seizure in violation of the Fourth Amendment (Count III), intentional and negligent infliction of emotional distress (Count IV), and loss of consortium and companionship (Count V). (See Doc. 1-1 ¶¶ 20-50). Jones and Smith move to dismiss the complaint in its entirety. The motion is fully briefed and ripe for disposition.

## II.    **Legal Standard**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted. See FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the complaint, matters of public record, [and] undisputedly authentic documents if the complainant's claims are based upon these documents."

Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar.

Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the

defendant fair notice of what the . . . claim is and the grounds upon which it rests."

Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court conducts

a three-step inquiry.  See Santiago v. Warminster Township, 629 F.3d 121, 130-31

(3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a

plaintiff must plead to state a claim.'"  Id. at 130 (alteration in original) (quoting

Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a

claim must be separated; well-pleaded facts are accepted as true, while mere legal

conclusions may be disregarded.  Id. at 131-32; see Fowler v. UPMC Shadyside, 578

F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual

allegations, it must determine whether they are sufficient to show a "plausible claim

for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550

U.S. at 556.  A claim is facially plausible when the plaintiff pleads facts "that allow[]

the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  Iqbal, 556 U.S. at 678.

**III.   Discussion**

The Witters allege that defendants violated their Fourth Amendment right to

be "secure in their persons, houses, papers, and effects," see U.S. CONST. amend.

IV, because shooting Otis constituted an unreasonable destruction of their personal

property and thus an unlawful seizure, (see Doc. 1-1 ¶¶ 32-43).  For that injury, they

seek redress under Section 1983.  They also raise various state tort theories, including loss of consortium and companionship.  (See Doc. 1-1 ¶¶ 20-31, 44-50). Defendants rejoin that they are entitled to qualified immunity; that the Witters have not adequately pled Smith's personal involvement in the alleged Fourth Amendment violation; that each state-law claim is barred by sovereign immunity; and that Pennsylvania does not recognize loss of consortium for injuries to pets. (See Doc. 10 at 3-10).

> **A.    Federal Claim – Section 1983**

Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983.  The statute is not a source of substantive rights but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a Section 1983 claim, a plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).

Defendants raise two distinct challenges to the Witters' Section 1983 claim. First, they argue that qualified immunity shields them from liability because, although "the **_killing_** of a person's dog by a law enforcement officer constitutes a seizure under the Fourth Amendment," our court of appeals has not determined that the same is true for non-fatal shootings.  (See Doc. 10 at 5 (quoting Brown v. Muhlenberg Township, 269 F.3d 205, 210 (3d Cir. 2001) (emphasis in brief))).

Second, they contend that even if the shooting was a seizure in and of itself, the Witters have not pled that Smith was personally involved given their specific allegation that Jones pulled the trigger.  (See id. at 6 (citing Kost v. Kozakiewicz, 1 F.3d 176, 184 (3d Cir. 1993)).

### 1. *Qualified Immunity*

Qualified immunity protects government officials from civil liability pursuant to Section 1983 where their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231-22 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Courts must engage in a two-pronged analysis, examining "whether the facts that a plaintiff has [alleged or] shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of [the] defendant's alleged misconduct."  See Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232).  Defendants' argument implicates both prongs, (see Doc. 10 at 5-6), and, in particular, two decisions by our court of appeals: Brown v. Muhlenberg Township, 269 F.3d 205, and Bletz v. Corrie, 974 F.3d 306 (3d Cir. 2020).

In Brown, the court considered the fatal shooting of a family's dog, Immi, by a police officer.  Immi had wandered out of the family's fenced yard, through a broken gate, and into an adjacent parking lot.  See Brown, 269 F.3d at 208-09.  The officer, Robert Eberly, shot Immi repeatedly and without provocation; a neighbor later testified that he heard the dog's owner screaming at the officer through an open window something to the effect of, "That's my dog, don't shoot!"  See id. at

6

209.  The court began by observing that a seizure occurs for Fourth Amendment purposes when "there is some meaningful interference with an individual's possessory interests in that property," such as its destruction.  See id. at 209-10, 211 (quoting <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984)).  Because people have possessory interests in their pets, the court held that a reasonable officer in Eberly's position would have known that it was unlawful to shoot someone's dog "in the absence of a substantial public interest that would be served by the destruction." <u>See</u> <u>id.</u> at 211.  According to the *allegata*, Officer Eberly hesitated before shooting Immi, "who posed no imminent danger," and he did so with full knowledge that her owners lived nearby and wanted to retrieve her.  <u>See</u> <u>id.</u> at 209, 211-12.  Accordingly, the court reversed the district court's order granting summary judgment to Eberly on qualified immunity grounds and remanded for further proceedings.  <u>See</u> <u>id.</u> at 219.

The court revisited <u>Brown</u> and applied its holding to a very different set of facts in <u>Bletz</u>.  <u>Bletz</u> involved another dog, Ace, who was released from a back door while several law enforcement officers were swarming the property in an attempt to serve an arrest warrant.  <u>See</u> <u>Bletz</u>, 974 F.3d at 307.  One of the officers, Jeremy Corrie, fired three shots, killing Ace.  <u>See</u> <u>id.</u>  The court observed that the only witnesses to the incident stated that Ace had charged Officer Corrie—"growling and showing his teeth, as though about to attack"—and "did not relent until subdued by the third bullet."  <u>See</u> at 310-11.  Reviewing its decision in <u>Brown</u>, the court reaffirmed that state interests may justify even the "extreme intrusion" of destroying a pet in the owner's presence when it poses an imminent danger to life

7

or property.  See id. at 310 (quoting Brown, 269 F.3d at 210-11).  The court then joined several other circuits in holding that the use of deadly force against a household pet is reasonable when the pet poses an imminent threat to a police officer's safety.  See id.  The panel affirmed the district court's order granting summary judgment in favor of the officers on the grounds that their actions did not violate the Fourth Amendment.  See id. at 311.

Defendants have not compared or contrasted the factual allegations of the instant case to those of Bletz or Brown.  (See Doc. 10 at 5).  Rather, they argue that the absence of a case squarely holding that the *non-fatal* shooting a pet is a seizure resolves the qualified immunity inquiry in their favor because the underlying Fourth Amendment right was not clearly established.  (See id. at 5-6).  We disagree. Reading the complaint in the light most favorable to the Witters, the factual scenario at bar is more akin to Brown than Bletz.  The Witters allege that Otis had no history of violent behavior, that he did not pose an imminent danger or exhibit "threatening gestures or actions," and that defendants did not fear for their safety when they encountered him.  (Compare Doc. 1-1 ¶ 12, and Brown, 269 F.3d at 209, with Bletz, 974 F.3d at 307).

Moreover, it is well-settled that plaintiffs need not identify a case that is directly on point to demonstrate that the right at issue was clearly established.  See Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citing Anderson v. Creighton, 483 U.S. 635, 640 (1987)).  It is sufficient to demonstrate that existing precedent has "placed the statutory or constitutional question beyond debate."  See id.  The Brown court understood that a Fourth Amendment seizure "occurs whenever there is some

meaningful intrusion with an individual's possessory interest in th[eir] property."
<u>See</u> <u>Brown</u>, 269 F.3d at 211 (citing <u>Jacobsen</u>, 466 U.S. at 113).  A reasonable officer
in defendants' shoes would have understood that shooting someone's pet without
proper justification crosses a constitutional line.  That Otis survived—distinguishing
this case from <u>Brown</u>—is irrelevant to the question of qualified immunity.  As
alleged, defendants' actions interfered with the Witters' ownership of Otis the
moment they shot him.  The shooting destroyed several of Otis' teeth and part of his
jaw, and it has had a lasting psychological effect on both him and the Witters family.
(<u>See</u> Doc. 1 ¶¶ 14-18).  Defendants are not entitled to qualified immunity under
these circumstances.

### 2.    *Personal Involvement – Officer Smith*

Defendants also contend that the Witters' Section 1983 claim against Smith
should be dismissed for lack of personal involvement because the complaint only
alleges that Jones shot Otis.  (<u>See</u> Doc. 10 at 6 (citing <u>Kost</u>, 1 F.3d at 184)).  On this
point, we agree.  For liability to attach in a civil rights action, a defendant must have
been personally involved in the alleged wrongs.  <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d
1195, 1207 (3d Cir. 1988).  This requirement may be satisfied by allegations of direct
participation, personal direction, or actual knowledge and acquiescence, which
must be made with appropriate particularity.  <u>See</u> <u>id.</u>  Although the Witters aver
that both agents trespassed onto their property, their Fourth Amendment claim
stems directly from Jones' decision to shoot Otis.  (<u>See</u> Doc. 1-1 ¶¶ 8-11, 34).  Smith's
mere presence when Jones pulled the trigger, without more, is not enough to
demonstrate his personal involvement in the conduct that underlies the Witters'

Fourth Amendment claim.  See Jutrowski v. Township of Riverdale, 904 F.3d 280, 290 (3d Cir. 2018) (citing Anela v. City of Wildwood, 790 F.2d 1063, 1067-68 (3d Cir. 1986) (further citation omitted)).  We will dismiss their claim against Smith without prejudice.  This deficiency is factual, rather than legal.  Because curative amendment is conceivable, we will grant the Witters leave to amend their complaint if appropriate.  See Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002); FED. R. CIV. P. 15(a)(2) (courts should "freely give leave when justice so requires"); see, e.g., Guzzo v. Allen Distrib., 479 F. Supp. 3d 91, 98 (M.D. Pa. 2020) (permitting amendment "if, in fact, [plaintiff] has a good-faith basis for doing so").

> **B.    State Law Claims**

The Commonwealth of Pennsylvania generally immunizes state employees from suit, subject to just ten enumerated exceptions, none of which apply here.  See 1 PA. STAT. AND CONS. STAT. ANN. § 2310; 42 PA. STAT. AND CONS. STAT. ANN. § 8522(b).  To enjoy sovereign immunity, a Commonwealth defendant must have been acting within the scope of their employment when they committed the challenged acts.  See 1 PA. STAT. AND CONS. STAT. ANN. § 2310; Larsen v. State Emps.' Ret. Sys., 553 F. Supp. 2d 403, 420 (M.D. Pa. 2008).  The factors a court must consider to resolve the scope-of-employment question include whether the conduct: (1) was "of a kind and nature" that the individual was hired to perform; (2) occurred "within authorized time and space limits"; and (3) was motivated by a purpose to serve the individual's employer.  See CNA v. U.S., 535 F.3d 132, 146 (3d Cir. 2008) (quoting Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000) (quoting

RESTATEMENT (SECOND) OF AGENCY § 228)).  All three factors must be answered in the affirmative for sovereign immunity to apply.  See id. at 147.

Employees operate outside the scope of their employment when they act in an "outrageous or whimsical" manner.  See Frankel v. Moody, 393 F.2d 279, 282 (3d Cir. 1968) (quoting Potter Title & Tr. Co. v. Knox, 113 A.2d 549, 551 (Pa. 1955)); see also Haas v. Barto, 829 F. Supp. 729, 734 (M.D. Pa. 1993).  For instance, although certain employees might be expected to use force to achieve "an authorized result," see Zion v. Nassan, 283 F.R.D. 247, 267 (W.D. Pa. 2012) (citing, inter alia, Lunn v. Boyd, 169 A.2d 103, 104 (Pa. 1961)), aff'd 556 F. App'x 103 (3d Cir. 2014) (nonprecedential), if they use more force than necessary, or if they are motivated by personal animus, their actions might lack a sufficient nexus with "the business of the employer."  See Costa v. Roxborough Mem'l Hosp., 708 A.2d 490, 493 (Pa. Super. Ct. 1998); Fitzgerald v. McCutcheon, 410 A.2d 1270, 1271-72 (Pa. Super. Ct. 1979).  In such circumstances, an employer will not be held vicariously liable for the acts of their employees.  See id.

The Witters raise four common law claims: trespass to land (Count I), trespass to chattel (Count II), intentional and negligent infliction of emotional distress (Count IV), and loss of consortium and companionship (Count V).  Each claim implicates both Smith and Jones, who invoke sovereign immunity.  (See Doc. 10 at 6).  We will deny defendants' motion with respect to Count I; dismiss Count II with respect to Smith only; and dismiss Counts IV and V in full.  We will grant the Witters leave to amend Count II and IV only.

### 1.    *Count I: Trespass to Land*

To establish a claim for trespass, a plaintiff must prove that someone intentionally entered upon their land without "a privilege to do so."  See <u>Kennedy v. Consol Energy, Inc.</u>, 116 A.3d 626, 636 (Pa. Super Ct. 2015) (citing <u>Kopka v. Bell Tel. Co.</u>, 91 A.2d 232, 235 (Pa. 1952)).  The Witters allege that Smith and Jones arrived unannounced at their home on July 26, 2021, to determine if it would be "a suitable location for an inmate to be released on parole" that November.  (<u>See</u> Doc. 1-1 ¶¶ 6, 7).  After receiving no answer at the front door, Smith and Jones purportedly opened a latched gate and entered the family's fenced backyard.  (<u>See</u> <u>id.</u> ¶ 8).  The Witters unambiguously state that they did not authorize or invite the agents to enter their backyard.  (<u>See</u> <u>id.</u> ¶¶ 7, 9).  No one meaningfully disputes that the agents were motivated at least in part by a purpose to serve their employer.

We cannot say with confidence, though, that entering private property—particularly that of individuals not under state supervision—without permission is the kind of work parole agents are expected to perform or that doing so is "within authorized time and space limits" imposed by the agency.  <u>See</u> <u>CNA</u>, 535 F.3d at 146.  Indeed, some courts have categorically held that sovereign immunity does not bar suits against Commonwealth employees when plaintiffs plausibly allege a *prima facie* case for trespass because acts lacking legal justification are not within the scope of those employees' duties.  <u>See, e.g.</u>, <u>Soler v. Vanim</u>, No. 06-4975, 2007 WL 9810902, at *7 (E.D. Pa. Nov. 19, 2007).  For present purposes, however, we need only acknowledge that, in Pennsylvania, "fact-intensive" scope-of-employment questions "properly" are left for juries to decide.  <u>See</u> <u>Justice v. Lombardo</u>, 208 A.3d

1057, 1060 (Pa. 2019).  In <u>Lombardo</u>, the Pennsylvania Supreme Court cautioned against presuming that "every act by an employee occurs 'in the discharge of a duty owing' to his employer."  <u>See</u> <u>id.</u> at 1074 (quoting <u>Howard v. Zaney Bar</u>, 85 A.2d 401, 402 (Pa. 1952)).  Smith and Jones seek just such a presumption.  (<u>See</u> Doc. 10 at 8 (claiming sovereign immunity because underlying conduct "occurred when [defendants] were employed and acting as agents for the PBPP")).  Lacking factual details regarding the nature of Smith and Jones' duties and the circumstances surrounding their visit to the Witters residence, we cannot resolve the scope of employment inquiry at this stage.  The Witters' trespass claim is plausible, and we will therefore deny defendants' motion with respect to Count I.

### 2.    *Count II: Trespass to Chattel*

To establish a claim for trespass to chattel, a plaintiff must show that the defendant intentionally dispossessed them of, or intermeddled with, the use of their property.  <u>See</u> <u>Pestco, Inc. v. Associated Prods., Inc.</u>, 880 A.2d 700, 708 (Pa. Super. Ct. 2005).  Otis is the chattel at issue here, and the Witters plausibly allege that the injuries he suffered imposed both immediate and ongoing financial burdens and interfered with their ability to enjoy his company.  (<u>See</u> Doc. 1-1 ¶¶ 15-17, 30-31).  But, as discussed above, the Witters do not articulate any basis for holding Smith liable for the dog's injuries.  <u>See</u> *supra* Part III.A.2.  We will dismiss Smith from Count II without prejudice.

In contrast, the complaint plausibly states a claim with respect to Jones.  Courts routinely hold that "where excessive force is in question, so too is whether that use of force fell within the scope of the defendant's employment."  <u>See</u> <u>Degroat</u>

v. Felsman, No. 3:16-CV-1186, 2019 WL 652345, at *3 (M.D. Pa. Feb. 15, 2019) (collecting cases). Our court of appeals has characterized the act of shooting a pet who poses no imminent safety risk as "extreme." See Brown, 269 F.3d at 211; see also Pettit v. New Jersey, No. 09-CV-3735, 2011 WL 1325614, at *5 (D. N.J. Mar. 30, 2011) (amount of force to be employed in restraining an animal "waxes and wanes with the danger it possesses") (citing Brown, 269 F.3d at 210-11). Even if we were to assume that Jones was acting within the scope of his employment when he entered the Witters' backyard, the allegation—which has not yet been proven—that he shot Otis without provocation, (see Doc. 1-1 ¶ 12), is sufficiently outrageous to defeat sovereign immunity. Thus, we will deny defendants' motion insofar as Count II implicates Jones.

3.  ***Count IV: Intentional and Negligent Infliction of Emotional Distress***

A claim of intentional infliction of emotional distress requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that the same was "substantially certain" to occur. See Brown, 269 F.3d at 218 (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).[1] Negligent infliction of emotional distress occurs when (1) a defendant

---

[1] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress. See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000). Our court of appeals has predicted, however, that the Commonwealth's high court ultimately will adopt the Restatement (Second) of Torts' formulation. Williams v. Guzzardi, 875 F.2d 46, 50-51 (3d Cir. 1989); see also Mills v. City of Harrisburg, 589 F.Supp.2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652). And the Superior Court has outlined an applicable

owes a contractual or fiduciary duty to the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger and reasonably feared impending physical injury, or (4) the plaintiff observed a tortious injury to a close relative.  See Toney v. Chester Cnty. Hosp., 961 A.2d 192, 197-98 (Pa. Super. Ct. 2008) (*en banc*) (citing Doe v. Phila. Cmty. Health Alternatives AIDS Task Force, 745 A.2d 25, 26 (Pa. Super Ct. 2000), aff'd 767 A.2d 548 (Pa. 2001)).  Whether intentional or negligent, claims of tortious infliction of emotional distress must include allegations that the plaintiff suffered "some type of resulting physical harm due to the defendant's outrageous conduct."  Reedy v. Evanson, 615 F.3d 197, 231 (3d Cir. 2010) (quoting Swisher v. Pitz, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005)); see Love v. Cramer, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992).

The Witters' claim for emotional distress damages derives entirely from Jones' act of shooting Otis.  (See Doc. 1-1 ¶¶ 45-46).  Smith's lack of personal involvement in that act entitles him to dismissal from Count IV.  (See id. ¶ 11).  More fundamentally, though, both defendants are entitled to dismissal because the Witters do not allege that they suffered any physical harm in connection with their emotional distress.  The only physical injuries the complaint identifies are Otis's.  (See Doc. 1-1 ¶ 17).  The Witters merely assert that they "no longer feel safe in their own home" and have lost confidence in law enforcement.  (See id. ¶ 18).  These assertions are insufficient to state a claim for intentional or negligent infliction of

standard.  See Wilson v. Am. Gen. Fin., Inc., 807 F. Supp. 2d 219, 301-2 (W.D. Pa. 2011) (citing Reardon v. Allegheny Coll., 926 A.2d 477, 488 (Pa. Super. Ct. 2007)).

emotional distress under Pennsylvania law.  See Reedy, 615 F.3d at 231 (quoting

Swisher, 868 A.2d at 1230).  We will grant defendants' motion to dismiss Count IV,

and we will grant the Witters leave to amend to cure these factual deficiencies, if

appropriate and in good faith.  See Grayson, 293 F.3d at 108; FED. R. CIV. P. 15(a)(2)

(courts should "freely give leave when justice so requires").

### 4.    *Count V: Loss of Consortium and Companionship*

Finally, the complaint includes a claim for losses of consortium and

companionship emanating from Otis' injuries.  (See Doc 1-1 ¶¶ 47-50).  Defendants

request dismissal of Count V with prejudice because such claims do not exist in

Pennsylvania as applied to pets.  (See Doc. 10 at 8 (citing Daughen v. Fox, 539 A.2d

858, 864-65 (Pa. Super. Ct. 1988)).  The Witters candidly concede that Pennsylvania

courts do not recognize such claims, but they urge us to do so in the first instance

on the ground that "[a] number of states have recognized recovery of noneconomic

damages" for pets, including loss of companionship.  (See Doc. 17 at 12-15 (citing

William C. Root, Note, *"Man's Best Friend": Property or Family Member? An*

*Examination of the Legal Classification of Companion Animals and Its Impact on*

*Damages Recoverable for Their Wrongful Death or Injury*, 47 VILL. L. REV. 423

(2002))).

A generous recasting of scholarship—which recognizes that it advances a

minority view[2]—cannot prevail over numerous and longstanding holdings from

---

[2] (Compare Doc. 17 at 14 (asserting "[a] number of states" have recognized
loss of companionship for pets), with Root, *Man's Best Friend*, 47 VILL. L. REV. at
432-33 (Florida court upheld punitive and compensatory damages based on owner's

Pennsylvania courts.  The Commonwealth's highest court has steadfastly maintained that common-law loss of consortium claims are reserved exclusively for spouses, and it has never recognized a "loss of companionship" claim based upon injuries to a family pet.  See Dep't of Pub. Welfare v. Schultz, 855 A.2d 753, 755 (Pa. 2004) (citing Cleveland v. Johns-Manville Corp., 690 A.2d 1146, 1149 (Pa. 1997)); Quinn v. City of Pittsburgh, 90 A. 353, 354 (Pa. 1914)); see also Tucker v. Phila. Daily News, 848 A.2d 113, 127 (Pa. 2004) (consortium "the legal right of one spouse to the company, affection, and assistance of and to sexual relations with the other").  Count V does not contain a plausible claim for relief as a matter of law, and amendment is futile.  See Grayson, 293 F.3d at 108.

**IV.**   **Conclusion**

We will grant in part and deny in part defendants' motion to dismiss.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:    June 10, 2024

---

mental suffering after malicious killing of dog), and id. at 433-34 (Hawaii court upheld recovery for infliction of emotional distress arising out of dog's death)); see also id. at 424 (majority of states do not allow recovery for emotional suffering from wrongful injury or death to companion animal)).